**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**TIFFANY NICHOLE WYATT,**

       **Plaintiff,**

**v.**                                 **Case No.: 5:14-cv-19734**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 13, & 14).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's motion for judgment

on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

In May 2010, Plaintiff Tiffany Nichole Wyatt ("Claimant") filed applications for SSI[1] and DIB, alleging a disability onset date of July 1, 2008, due to "asthma, heart murmur, and learning disability."[2] (Tr. at 16, 218, 259). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 89-98, 103-16). On March 25, 2011, Claimant filed a request for an administrative hearing, (Tr. at 117), which was initially held on April 20, 2012 before the Honorable James P. Toschi, Administrative Law Judge ("ALJ"). (Tr. at 51-84). During the course of the administrative hearing, it was discovered that school records submitted for consideration did not belong to Claimant. (Tr. at 79). The ALJ ordered that the hearing be continued in order to obtain the correct school records and an updated psychological consultative examination. (Tr. at 79-80). A subsequent hearing was held by the ALJ on December 13, 2012. (Tr. at 33-50). At the beginning of the hearing, the ALJ noted that the file still contained a school record not attributable to Claimant, which the ALJ ordered be removed from the file. (Tr. at 35-36). By written decision dated December 21, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 16-27). The ALJ's decision became the final

---

[1] Claimant's SSI application is not in the administrative record; instead, the record contains her husband's application for SSI. (Tr. at 241).

[2] Claimant received SSI as a child due to a cardiac impairment and asthma. (Tr. at 16). Based on medical improvement, Claimant received a notice of benefit termination in March 2001. (*Id.*) Although she filed a request for an administrative hearing, she did not appear at the hearing. (*Id.*) Consequently, Claimant's receipt of SSI was ceased. (*Id.*)

decision of the Commissioner on January 30, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 5-8).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).[3] (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a responsive brief, (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.  __Claimant's Background__

Claimant was 21 years old on the alleged disability onset date and 26 years old on the date of the ALJ's decision. (Tr. at 27, 218). She has at least a high school education and communicates in English. (Tr. at 56, 258-59). Claimant reported that she was enrolled in special education services while in school, and her school records show that she repeated the second grade. (Tr. at 61, 537). She has previously worked as a housekeeper at a hotel, a caterer, and a cashier at a gas station. (Tr. at 260, 264-69).

## III.  __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

---

[3] The Appeals Council granted Claimant an extension of time to file this action. (Tr. at 1).

423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir.

1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.*

5

§§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2009. (Tr. at 18, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 1, 2008, the alleged disability onset date. (Tr. at 19, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "learning disability and borderline intellectual functioning." (Tr. at 19-20, Finding No. 3). The ALJ also considered Claimant's other potential impairments, including history of asthma, history of heart murmur, hydronephrosis, and goiter, but found that these impairments were well controlled or produced no significant symptoms. (Tr. at 20).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-22, Finding No. 4). The ALJ specifically considered Listing 12.02 (organic mental disorders) and Listing 12.05 (mental retardation). (Tr. at 20-22). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: detailed instructions with simple written instructions and no fast pace work or strict production quotas, and reading skill at the fifth-grade level.

(Tr. at 22-26, Finding No. 5). At the fourth step, the ALJ found that Claimant was able to perform her past relevant work as a cashier, which the vocational expert classified as unskilled light work. (Tr. at 27, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 27, Finding No. 7).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises a single challenge to the Commissioner's decision. Specifically, Claimant argues that the ALJ committed reversible error and violated Claimant's due process right to a fundamentally fair hearing by considering evidence that related to another person. (ECF No. 10 at 10-12). Claimant points out that at her first administrative hearing, it was discovered that school records contained in Claimant's file did not belong to Claimant. (*Id.* at 5, 11). Some of those records were stricken, and the hearing was continued in order to gather the correct school records in addition to obtaining a new psychological consultative examination. (*Id.* at 11). However, according to Claimant, while the incorrect records contained in Exhibit B-2E were removed from the record, they continued to exist in Exhibit B-1F, which was not removed from Claimant's file until the second administrative hearing. (*Id.*) Consequently, Claimant insists that the consultative psychological examination performed after the first administrative hearing is tainted by school records that did not belong to Claimant. (*Id.*) In particular, Claimant notes that the consultative examiner, Kelly Robinson, M.A., referenced a prior full scale IQ score of 93 that was contained in the school records

belonging to someone other than Claimant. (*Id.*) Claimant asserts that Ms. Robinson used this prior IQ score in forming her validity and diagnostic opinions. (*Id.*) Moreover, Claimant contends that any confusion is compounded by the fact that the ALJ's written decision is silent as to the weight assigned to Ms. Robinson's opinions. (*Id.*) In addition, Claimant argues that a medical expert at Claimant's first administrative hearing, C. David Blair, Ph.D., testified that an updated psychological consultative examination would be helpful in assessing Claimant's limitations, and given Ms. Robinson's reliance on records not attributable to Claimant, she insists that Ms. Robinson's updated examination was insufficient. (*Id.* at 11-12).

In response, the Commissioner asserts that the Claimant received a full and fair hearing. (ECF No. 13 at 10). More specifically, the Commissioner notes that the ALJ took steps to correct the administrative record as soon as it was discovered that the school records being cited and relied upon did not belong to the Claimant. (*Id.*) The Commissioner points out that the ALJ removed the incorrect records and continued the hearing in order to obtain the correct records and a new consultative examination. (*Id.*) The Commissioner stresses that after obtaining the correct school records and the results of an additional psychological examination, a new hearing was held where additional medical and vocational expert testimony was adduced. (*Id.*) In addition, the Commissioner avers that the ALJ did not consider any erroneous records in reaching his decision. (*Id.*) The Commissioner notes that Dr. Blair testified at the second administrative hearing and excluded the incorrect school records found in Exhibits B-2E and B-1F when determining Claimant's mental capabilities and limitations. (*Id.*) In relation to Ms. Robinson's opinion, the Commissioner seems to concede that Ms. Robinson relied on a full scale IQ score of 93 not attributable to Claimant in forming her

opinions. (*Id.* at 11 n.4). Notwithstanding, the Commissioner asserts that Dr. Blair considered any effect that Ms. Robinson's error may have had on her findings at the second administrative hearing. (*Id.*) Finally, the Commissioner contends that Claimant has not demonstrated how her RFC or disability determination was "harmed" given that the administrative record was corrected by the ALJ and a medical expert testified based on an accurate record. (*Id.*)

In Claimant's reply memorandum, she insists that the ALJ's written decision cites testimony from Dr. Blair and Ms. Robinson, who both relied on evidence that did not belong to Claimant. (ECF No. 14 at 1). Moreover, Claimant again argues that the ALJ failed to state the weight that he assigned to Ms. Robinson's opinion, and that the record does not contain an untainted updated psychological examination, as recommended by Dr. Blair at the first administrative hearing. (*Id.* at 2).

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed the entire record and summarizes the evidence pertinent to Claimant's challenge below.

### A. School Records

On March 11, 1997, Claimant, a fourth grader at that time, was referred for an evaluation due to problems she was having academically. (Tr. at 547-50). The evaluation was performed on June 3, 1997 by Joyce Hall, M.A., a special education specialist for the Raleigh County School System. (Tr. at 547). Claimant had attended several other elementary schools before moving to the Raleigh County School District, and according to the referral, various interventions had been tried, including extra time to complete work, peer tutoring, and modified assignments, but only achieved limited results. (*Id.*) Claimant had received "N's" (representing needs improvement) in all subjects except

spelling. (*Id.*) Claimant indicated to Ms. Hall that she found reading difficult, but math was "pretty easy." (Tr. at 548). Ms. Hall observed that Claimant had normal vision, hearing, and gross and fine motor skills. (*Id.*) Her attention and activity levels were also found to be normal. (*Id.*) On the Woodcock Johnson Achievement Test, Claimant scored an 80 in Broad Reading, 94 in Broad Math, 83 in Broad Written Language, and 81 in Broad Knowledge. (*Id.*) Ms. Hall found that Claimant scored within the low average reading range with difficulty in reading comprehension and word identification skills. (*Id.*) Claimant performed better in math and scored within the average range, although she had some difficulty counting money and understanding monetary concepts. (Tr. at 549). Ms. Hall noted that Claimant's written language and knowledge test scores fell within the low average range as well. (*Id.*) Ms. Hall provided recommendations to assist Claimant's academic performance until the Special Education Services Eligibility Committee could review the results the evaluation. (Tr. at 549-50).

On October 16, 1997, Claimant was evaluated by a Raleigh County school psychologist, Mary C. Prentice, M.A. (Tr. at 551-53). Ms. Prentice administered the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III"). She recorded that Claimant demonstrated a verbal IQ score of 83, performance IQ score of 100, and a full scale IQ score of 90. (Tr. at 552). Ms. Prentice opined that the scores were fairly reliable given her observations of Claimant. (*Id.*) She recorded that Claimant's scores placed her in the low average range for verbal ability, and in the average range for performance ability and overall intellectual capacity. (*Id.*) Ms. Prentice offered recommendations to assist Claimant with her academic weaknesses. (Tr. at 552-53). She found that a comparison of Claimant's full scale IQ with standard scores on the achievement measure revealed no severe ability-achievement discrepancies. (Tr. at 553). Ms. Prentice asserted

that although it did not appear Claimant would qualify for special education services, the Eligibility Committee would convene to formulate an appropriate education plan. (*Id.*)

On February 25, 1998, the Raleigh County School Eligibility Committee recommended that Claimant participate in further testing, which was conducted on March 27, 1998 by Victoria Anne Smolsky, M.A. (Tr. at 542-46). Ms. Smolsky administered the Wechsler Individual Achievement Test ("WIAT"), on which Claimant scored 87 in basic reading, 86 in mathematical reasoning, 87 in spelling, 91 in reading comprehension, 77 in numerical operations, and 73 in written expression. (Tr. at 543). Ms. Smolsky noted that a score of 100 is considered average. (*Id.*) Ms. Smolsky opined that the test results represented an adequate estimate of Claimant's academic ability. (*Id.*) According to Ms. Smolsky, the results indicated that Claimant was functioning within the eighth to eighteenth percentile ranges in the broad areas of the WIAT. (Tr. at 544). Thus, Ms. Smolsky provided numerous recommendations to assist Claimant in the areas of written language, reading, and math. (Tr. at 544-45).

On January 18, 2001, David B. Wamsley, Certified School Psychologist, saw Claimant for a psychoeducational evaluation to help with program planning to meet Claimant's needs. (Tr. at 537). At that time, Claimant was receiving Home Bound services as her mother was concerned about "one or more incidents" that happened at school. (*Id.*) Mr. Wamsley evaluated Claimant using the WISC-III, human figure drawing, Bender Visual Motor Gestalt Test, WIAT, and a structured interview. (*Id.*) He noted that Claimant had repeated the second grade. (*Id.*) On the WISC-III, Claimant scored 73 in verbal IQ, 89 in performance IQ, and 78 in full scale IQ. (Tr. at 538). Mr. Wamsley found that Claimant demonstrated borderline functioning in most test areas,

which he believed could explain her academic difficulties. (*Id.*) Claimant experienced difficulty with items requiring verbal expression, verbal logical problem solving, verbal abstract thinking, and long-term memory for factual detail. (*Id.*) On the WIAT, Claimant earned a composite score of 81 in reading (grade equivalence 5.5), 77 in math (grade equivalence of 5.4), and 83 in writing (grade equivalence of 5.7). (Tr. at 539). Based on the WIAT results, Mr. Wamsley found that Claimant's academic skills were well below the expected score for her age and grade; however, the scores fell within the range anticipated when compared to Claimant's full scale score on the WISC-III. (*Id.*) Overall, Mr. Wamsley opined that Claimant possessed cognitive abilities in the low average or borderline range and that her academic skills evidenced she was working up to her potential. (Tr. at 540). Mr. Wamsley asserted that Claimant would need to continue with some form of alternative educational service and that it would be unlikely that she would find even minimum success in a regular classroom at the seventh or eighth grade level. (*Id.*)

An Eligibility Committee Review Report was completed by the Raleigh County Eligibility Committee on November 7, 2003. (Tr. at 352-55). The Committee determined that Claimant had specific learning disabilities and would continue to require specially designed instructions and services. (Tr. at 352). Based upon the prior evaluation, the report noted that Claimant did not have a discrepancy between ability and achievement; however, she did continue to need specially designed instruction. (*Id.*)

On March 3, 2005, Claimant completed a Student Interest/Preference Survey. (Tr. at 340-41). She indicated that during high school, she would like to learn spelling and work skills. (Tr. at 340). She described herself as dependable, patient, responsible, and hard working. (*Id.*) After high school, Claimant wished to attend a four-year college

12

and obtain "semi-skilled" employment. (*Id.*) Specifically, Claimant hoped to become a pediatric nurse. (*Id.*)

An Individualized Education Program form was completed on March 21, 2005.[4] (Tr. at 343-51). The form was signed by teachers, Claimant's parent, and Claimant. (Tr. at 351). On that form, it was noted that Claimant continued to work on a standard diploma. (Tr. at 344). Claimant desired to attend college after high school and eventually become a nurse. (*Id.*) The form indicates that Claimant read very well, but at a slow pace and with weak comprehension ability. (Tr. at 345). The form further provides that Claimant would partake in job club training and a job fair as part of transition planning from high school to life after. (Tr. at 346). Claimant was to participate in State or District achievement tests with accommodations under standard conditions, including extra time for any timed test. (Tr. at 348-49). As for placement options, Claimant was placed in full-time regular education, and placement in a special education environment was deemed unnecessary. (Tr. at 350).

On November 4, 2006, an Exit Meeting Summary was signed by Claimant, her mother, teachers, and administrators. (Tr. at 338). The summary notes that Claimant had acquired twenty-seven credits meeting her high school graduation requirements. (*Id.*) The summary further stated that Claimant had met the goals of her individualized education program. (*Id.*) At the time that the summary was completed, Claimant was employed at a local store with plans to enter the nursing field by way of an LPN nursing program or RN program at a four-year college. (*Id.*) A summary of her academic achievement indicated that Claimant read well at a slower pace with difficulty in

---

[4] An Individualized Education Program is a written plan prepared by school personnel that sets out the unique academic needs and goals of a particular child with a disability and outlines the resources required to properly educate that child. *See Policy 2419,* West Virginia Department of Education.

comprehension. (Tr. at 339). Both her math and written language skills were noted to be below average. (*Id.*) In order to be successful in an academic setting, Claimant required modifications, such as study guides and extra time to take tests or complete assignments. (*Id.*) It was recommended that Claimant take an entrance examination for an LPN program or take the ACT if she desired to attend a four-year college. (*Id.*)

### B. Evaluations and Opinions

On July 30, 2010, Claimant attended a consultative medical evaluation with Mustafa Rahim, M.D. (Tr. at 373-75). With respect to the neurological portion of the examination, Dr. Rahim observed that Claimant was alert and oriented with normal speech and intact memory. (Tr. at 374). He also noted Claimant's ability to understand normal conversational voice with no difficulty. (*Id.*)

Kelly Robinson, M.A., performed a psychological evaluation on August 3, 2010, along with psychometrician, Elise Bowling. (Tr. at 378-83). Ms. Robinson observed that Claimant's grooming and personal hygiene were fair. (Tr. at 378). Ms. Robinson also noted that Claimant's speech production was good with normal rate and volume. (*Id.*) Claimant informed Ms. Robinson that she graduated from high school, but she was always placed in special education classes. (*Id.*) She further stated that she had received average grades, repeated one grade, and got along with others at school fairly well. (Tr. at 379). She told Ms. Robinson that she could read and write her name along with simple words; however, she had difficulty reading her mail and magazines. (Tr. at 378). Claimant also reported comprehension issues and problems filling out paper work. (*Id.*) Claimant was most recently employed as a convenience store worker where she worked for approximately one week before quitting. (Tr. at 379). She indicated that she quit her job because she moved. (*Id.*) At that job, Claimant was required to operate a cash

register as well as read and write a shift report. (*Id.*) Her longest period of employment was for two and one-half years as a cashier. (*Id.*)

Upon mental status examination, Ms. Robinson recorded that Claimant appeared oriented and alert. (Tr. at 380). Claimant's mood was euthymic, and her affect was broad and reactive. (*Id.*) Claimant demonstrated a logical and coherent thought process, normal thought content, fair insight, and judgment within normal limits. (*Id.*) Her immediate, recent, and remote memory were within normal limits. (*Id.*) Ms. Robinson determined that Claimant's concentration was mildly deficient based on the results of the Digit Span subtest of the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). (*Id.*) Ms. Bowling administered the WAIS-IV, on which Claimant demonstrated a verbal comprehension IQ of 66, perceptual reasoning IQ of 77, working memory score of 74, processing speed score of 86, and full scale IQ of 71. (Tr. at 381). Ms. Bowling noted that rapport during the testing was easily established and maintained, Claimant was cooperative and friendly during the testing, and she maintained a consistent level of effort throughout testing. (*Id.*) Ms. Bowling further recorded that Claimant was persistent during testing, her motor behavior was normal, her speech was easy to understand, and her mood appeared to have no effect on performance. (*Id.*) Overall, the results of the WAIS-IV were considered valid and reliable suggesting an intellectual functioning within the lower borderline range. (*Id.*) In addition to the WAIS-IV, Claimant was administered the Wide Range Achievement Test, Fourth Edition ("WRAT-IV"). (Tr. at 381-82). Claimant scored 84 in word reading, 87 in spelling, and 83 in arithmetic. (Tr. at 382). These results were considered valid for the same reasons that the WAIS-IV results were determined to be valid. (Tr. at 382). Claimant was provided no diagnosis under Axis I, and she was diagnosed with borderline intellectual

functioning under Axis II. (*Id.*) Ms. Robinson recorded that this diagnosis was based on her valid full scale IQ score of 71. (*Id.*)

In describing a typical day, Claimant stated that she spent time with her ex-husband, sometimes visited her ex-husband's grandmother's home, and took care of her baby by feeding him, changing his diapers, and bathing him. (*Id.*) She also indicated that she watched television, used the dishwasher, fed her dog, talked with her mother on the phone, did laundry, and went grocery shopping with her ex-husband and son. (*Id.*) With regard to social functioning, Ms. Robinson opined that Claimant's ability was within normal limits given her interaction during the examination. (*Id.*) Ms. Robinson also concluded that Claimant's persistence was within normal limits based on her WAIS-IV performance. (Tr. at 383). As for concentration and pace, Ms. Robinson opined that Claimant was mildly deficient given her performance on the WAIS-IV. (*Id.*) Ms. Robinson indicated that Claimant's prognosis was fair and that she would be capable of managing any benefits she might receive. (*Id.*)

On September 3, 2010, James Binder, M.D., completed a Psychiatric Review Technique. (Tr. at 416-29). Dr. Binder found that a mental RFC assessment would be necessary. (Tr. at 416). He determined that Claimant suffered from the medically determinable impairment of borderline intellectual functioning. (Tr. at 417). As for any functional limitations, Dr. Binder opined that Claimant experienced mild limitations in activities of daily living and maintaining social functioning. (Tr. at 426). Dr. Binder further indicated that Claimant had moderate limitations in maintaining concentration, persistence, or pace. (*Id.*) He noted that Claimant had experienced no episodes of decompensation of extended duration. (*Id.*) Dr. Binder also determined that Claimant did not meet the paragraph "C" criteria for Listing 12.02. (Tr. at 427). In the

Consultant's Notes section of the form, Dr. Binder summarized the results of Ms. Robinson's examination along with Claimant's reported activities in her Adult Function Report. (Tr. at 428). Dr. Binder noted that Claimant reported she could not pass the test to obtain a driver's license and that she experienced difficulty with directions and handling money. (*Id.*) Dr. Binder also recorded that Claimant indicated she was able to care for herself, watch television, perform light housework, care for a pet, perform some cooking, do laundry, shop, sew, play games, talk with others, visit with her stepson, and go to the doctor. (*Id.*) Dr. Binder opined that Claimant suffered from borderline intellectual function as evidenced by recent testing. (Tr. at 428). He determined that Claimant was credible based on the congruency of her history and medical records. (*Id.*)

That same day, Dr. Binder completed a Mental Residual Functional Capacity Assessment. (Tr. at 431-34). With respect to understanding and memory, Dr. Binder determined that Claimant was not significantly limited in her abilities to remember locations and work-like procedures, and understand and remember very short and simple instructions. (Tr. at 431). However, he found that Claimant was moderately limited in her ability to understand and remember detailed instructions. (*Id.*) As for sustaining concentration and persistence, Dr. Binder opined that Claimant was not significantly limited in her abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 431-32). However,

Claimant was moderately limited in her abilities to carry out detailed instructions and maintain attention and concentration for extended periods. (Tr. at 431). Dr. Binder further opined that Claimant was not significantly limited in social interaction or adaptation. (Tr. at 432). Dr. Binder concluded that even with the above limitations, Claimant would be capable of learning and performing basic work-like tasks. (Tr. at 433).

On May 15, 2012, Claimant again visited Ms. Robinson for a psychological evaluation. (Tr. at 554-60). The examination occurred after the first administrative hearing where it was discovered that certain school records in Claimant's file did not belong to Claimant. (Tr. at 79). Claimant informed Ms. Robinson that she had trouble reading a newspaper as well as reading directions. According to the Claimant, she had experienced problems with comprehension and "big words." (Tr. at 554). She also indicated that it was difficult for her to write letters or complete job applications. (*Id.*) Claimant reported that she was not seeking mental health treatment at that time. (Tr. at 555). In describing her work experience, Claimant asserted that she quit her last job as a convenience store worker because she "couldn't do it." (*Id.*) She further stated that she was fired from another convenience store job for not possessing "an id." (Tr. at 556).

Upon mental status examination, Ms. Robinson observed that Claimant appeared alert and oriented with a euthymic mood and broad affect. (*Id.*) Claimant's thought process was logical and coherent, and her thought content was unremarkable. (*Id.*) Her insight was fair and her judgment was within normal limits. (*Id.*) Ms. Robinson opined that Claimant's immediate, recent, and remote memory were within normal limits. (*Id.*) Claimant's concentration was also within normal limits, and she exhibited normal psychomotor behavior. (Tr. at 557). Ms. Bowling once again administered the WAIS-IV,

on which Claimant achieved 68 in verbal comprehension IQ, 73 in perceptual reasoning IQ, 77 in working memory, 76 in processing speed, and 68 in full scale IQ. (*Id.*) With regard to test validity, Ms. Bowling noted that Claimant seemed uninterested in testing and appeared to lack adequate motivation. (*Id.*) Claimant quickly gave up despite encouragement, and she worked at a rapid and impulsive pace. (*Id.*) Ms. Robinson or Ms. Bowling also noted in the validity analysis that Claimant graduated from high school with average grades and that she had been employed as a convenience store worker, waitress, and housekeeper. (*Id.*) Moreover, Ms. Robinson noted that Claimant had a past full scale IQ score of 93. (*Id.*) However, this score appears to have come from another student's school records that remained in Claimant's file after the first administrative hearing. (ECF No. 10 at 8 n.3); (ECF No. 13 at 11 n.4); (Tr. at 362). The record relied upon by Ms. Robinson was removed from Claimant's file at the second administrative hearing. (Tr. at 35-36). Ultimately, the WAIS-IV results were determined to be invalid due to Claimant's persistence and pace. (Tr. at 557).

On the WRAT-IV test, Claimant scored a 74 in word reading, 78 in spelling, and 85 in math computation. (Tr. at 557-58). Those scores were determined to be invalid for the same reasons mentioned in the WAIS-IV validity discussion. (Tr. at 558). Ms. Robinson diagnosed Claimant with rule out learning disorder, not otherwise specified.[5] (*Id.*) Ms. Robinson based her diagnosis on Claimant's report of learning problems. (*Id.*) With regard to Axis II, Ms. Robinson recorded that no diagnosis was given because Claimant had a past full scale IQ score of 93, which again was obtained from school

---

[5] The Diagnostic Statistical Manual of Mental Disorders, Am. Psych. Assoc., 56 (4th ed. text rev. 2000) ("DSM–IV"), states that a learning disorder not otherwise specified may include problems in reading, mathematics, and written expression that "together significantly interfere with academic achievement even though performance on tests measuring each individual skill is not substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education."

records not belonging to Claimant. (*Id.*) In addition, Ms. Robinson determined that Claimant's social functioning and concentration were within normal limits. (*Id.*) In contrast, Claimant's persistence and pace were deemed moderately deficient based on her performance on the WAIS-IV. (Tr. at 559). Ms. Robinson opined that Claimant's prognosis was fair and that she capable of managing any benefits that she may receive. (*Id.*)

On July 10, 2012, Ms. Robinson completed a Medical Source Statement of Ability to do Work Related Activities (Mental). (Tr. at 561-63). Ms. Robinson determined that Claimant's ability to understand, remember, and carry out instructions was affected by her impairment. (Tr. at 561). In particular, Ms. Robinson opined that Claimant had mild limitations understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple work-related decisions. (*Id.*) Claimant was found to be moderately limited in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related instructions. (*Id.*) In support of her opinions, Ms. Robinson noted that Claimant graduated from high school in special education classes and reported difficulty with learning, reading directions, and completing job applications. (*Id.*) Ms. Robinson also cited Claimant's rule out learning disorder diagnosis and the full scale IQ score of 93 that did not belong to Claimant. (*Id.*) In addition, Ms. Robinson opined that Claimant's impairment did not affect her ability to respond to changes in a routine work setting or interact appropriately with supervisors, coworkers, and the public. (Tr. at 562). Ms. Robinson further concluded that no other capabilities were affected by Claimant's impairment. (*Id.*)

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Claimant maintains that her right to due process, including a fair hearing, was violated when the ALJ considered evidence that did not relate to Claimant in denying her claim for benefits. (ECF No. 10 at 10-12). Social Security hearings are subject to due process considerations. *Mays v. Colvin*, 739 F.3d 569, 573 (10th Cir. 2014) (citing *Yount v. Barnhart*, 416 F.3d 1233, 1235 (10th Cir. 2005)). As pertinent here, "[d]ue process requires that a social security hearing be 'full and fair.'" *Flatford v. Chater*, 93 F.3d

1296, 1305 (6th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)); *see also Yancey v. Apfel*, 145 F.3d 106, 112 (2d Cir. 1998); *Farley v. Astrue*, No. 5:12CV29, 2013 WL 162444, at *2 (N.D.W.Va. Jan. 15, 2013). In order to succeed on a due process claim in the social security context, a claimant must demonstrate that she was prejudiced by the violation of her rights. *Mays*, 739 F.3d at 573; *Pearson v. Colvin*, No. 2:14-CV-26, 2015 WL 3757122, at *31 (N.D.W.Va. June 16, 2015); *cf. Ilunga v. Holder*, 777 F.3d 199, 208 (4th Cir. 2015) (recognizing that in order to prevail on due process claim in administrative immigration proceeding, plaintiff must demonstrate prejudice).

Generally, where medical records belonging to others are found in a claimant's file, the error is harmless so long as the ALJ recognized that the records were not attributable to the claimant, or substantial evidence still supports the ALJ's determination despite the consideration of third-party records. *See Melle v. Barnhart*, 64 F. App'x 848, 849 (3d Cir. 2003); *Brewer v. Chater*, 116 F.3d 489, 1997 WL 338600, at *2 (10th Cir. June 20, 1997) (unpublished table decision); *Goodwin v. Comm'r of Soc. Sec. Admin.*, No. 09-00469, 2011 WL 4498971, at *6-*7 (D. Haw. Sept. 26, 2011); *Hatfield-Blake v. Astrue*, No. 09-1072-SAC, 2010 WL 2232702, at *3 (D. Kan. June 1, 2010); *Pea v. Barnhart*, No. 07:7958, 2008 WL 4792923, at *3-*4 (E.D. La. Oct. 24, 2008). On the other hand, remand may be warranted where an ALJ meaningfully relies on a medical record belonging to a person other than the claimant and that reliance cannot be isolated from the ALJ's ultimate decision. For instance, in *Williams v. Astrue*, the district court reversed the Commissioner's decision and remanded based, in part, on the ALJ's adoption of the findings of a state agency medical consultant who relied on medical records not attributable to the claimant. No. CV406-19, 2008 WL 591288, at

*3-*4 (S.D. Ga. Mar. 3, 2008). Likewise, in *Smith-Chonko v. Colvin*, the district court remanded the Commissioner's decision where the ALJ relied on a third party's medical records to find that the claimant was not credible. No. 12-1301, 2013 WL 3772521, at *2 (W.D. Pa. July 17, 2013).

In this case, the ALJ was notified at the first administrative hearing that the school records contained in Exhibit B-2E did not belong to Claimant. (Tr. at 79). Based on this information, the ALJ disregarded his prior hypothetical question to the vocational expert. (*Id.*) The ALJ then asked Dr. Blair whether an updated psychological consultative examination would be useful, and Dr. Blair responded that "it wouldn't hurt" given that Ms. Robinson's first examination of Claimant occurred over one year prior to the hearing. (Tr. at 79-80). Dr. Blair added that obtaining the correct school records was "vital." (Tr. at 79). Accordingly, the ALJ continued the hearing, ordered an updated psychological consultative examination, and instructed Claimant's attorney to obtain Claimant's school records. (Tr. at 82-83).

At the second administrative hearing, Claimant's attorney asserted that the school records contained in Exhibit B-1F did not belong to Claimant, but had remained in Claimant's file. (Tr. at 35). The ALJ agreed and had those records purged from the file. (Tr. at 35-36). The ALJ then elicited testimony from two medical experts. First, the ALJ questioned Judith Brendemuehl, M.D., as to Claimant's physical impairments. (Tr. at 36). Dr. Brendemuehl testified that there was no objective evidence of any medically determinable physical impairments in the record. (Tr. at 36-37). The ALJ then turned to psychological impairments and questioned Dr. Blair on the issue. (Tr. at 37). Dr. Blair began his testimony by recognizing that Exhibits B-2E and B-1F were not attributable to Claimant. (*Id.*) Dr. Blair then summarized Claimant's school records, work history,

reported difficulties or symptoms, and activities of daily living. (Tr. at 38-39). He found that Claimant's allegations of forgetting to do things, such as eat or maintain her personal care, did not make sense given the record. (Tr. at 38). In addition, Dr. Blair found that there was no history of significant deficits in adaptive functioning. (*Id.*)

Dr. Blair also considered the results of both evaluations performed by Ms. Robinson. (Tr. at 37-42). He pointed out that Claimant achieved a full scale IQ score of 71 at the August 2010 evaluation with Ms. Robinson, but contrasted that score with Claimant's "significantly higher scores" on the WRAT-IV that same day. (Tr. at 38). Moreover, Dr. Blair noted that Ms. Robinson did not supply "any valid reasons" for her validity determination. (Tr. at 46). Dr. Blair testified that Claimant reported to Ms. Robinson at her second consultative evaluation that she could read and write her name or simple words, but Dr. Blair asserted that Claimant had greater ability than she indicated given her WRAT-IV and WIAT scores. (Tr. at 40). He noted that Claimant achieved a full scale IQ score of 68 at the second consultative evaluation and that Ms. Robinson had found the score to be invalid, partly due to the full scale IQ score of 93 from another person's school records. (Tr. at 41). Setting that full scale IQ score of 93 aside, Dr. Blair indicated that the observations of Claimant documented by Ms. Robinson and Claimant's history, including "what she has done in life" and her previous test scores, belied her WAIS-IV and WRAT-IV scores at the second psychological evaluation. (*Id.*) Dr. Blair concurred with Ms. Robinson's diagnosis of learning disorder, and after considering all of Claimants IQ scores (excluding the full scale IQ score of 93 belonging to someone else), Dr. Blair opined that Claimant fell within the borderline intellectual functioning range. (Tr. at 42). In addition, based on Claimant's WIAT scores, Dr. Blair determined that Claimant read at the fifth grade level. (Tr. at 43). With

24

regard to any functional limitations, Dr. Blair opined that Claimant should be limited to "[d]etailed but not complex" instructions and moderate work pace. (Tr. at 44). Dr. Blair also testified that there was no record evidence that Claimant experienced difficulty in dealing with the public, coworkers, or supervisors. (*Id.*)

After Dr. Blair's testimony concluded, the ALJ asked the vocational expert whether a person with Claimant's age, education, and experience who was limited to simple written instructions, no fast-paced work or strict production quotas, and reading at a fifth grade level could perform Claimant's past work as a cashier. (Tr. at 49). The vocational expert testified that a person with those limitations could perform Claimant's past work as a cashier at the unskilled light exertional level. (*Id.*)

At step two in the written decision, the ALJ found that Claimant suffered from a learning disability and borderline intellectual functioning. (Tr. at 19). The ALJ noted that Claimant had twice taken the WISC-III as a child and that her full scale IQ score on that test was 90 in 1997 while her full scale IQ score in 2001 was 78. (*Id.*) The ALJ also mentioned that Claimant scored at the 5.5 grade level in composite reading, 5.7 grade level in writing, and 5.4 grade level in math on the WIAT in 2001. (*Id.*) In addition, the ALJ acknowledged that Claimant was retained in second grade and received services for students with learning disabilities. (*Id.*) The ALJ went on to summarize Ms. Robinson's findings at both evaluations, and particularly noted that Claimant demonstrated a verbal comprehension IQ of 66, perceptual reasoning IQ of 77, working memory score of 74, processing speed score of 86, and full scale IQ of 71 after being administered the WAIS-IV at the first evaluation. (*Id.*) The ALJ noted that Ms. Robinson found these scores to be valid. (*Id.*)

At step three, the ALJ found that Claimant did not meet or medically equal the

criteria of Listings 12.02 and 12.05. (Tr. at 20-22). With regard to the paragraph B criteria of Listing 12.02 and the paragraph D criteria of Listing 12.05, the ALJ concluded that Claimant experienced no restriction in activities of daily living and social functioning. (Tr. at 20-21). In support of this finding, the ALJ cited Claimant's reported abilities to care for her pets, watch television, take care of her personal hygiene, wash dishes, talk on the phone, play games with other people, prepare simple meals, do laundry, sit on the porch, ride in a car, shop for groceries, pay bills, sew, attend church, care for her son, visit relatives, attend doctor's appointments, and travel to Charleston, West Virginia. (*Id.*) The ALJ also emphasized that Ms. Robinson found that Claimant's social functioning was within normal limits at both evaluations. (Tr. at 21). As for maintaining concentration, persistence, and pace, the ALJ found that Claimant experienced moderate difficulties given Ms. Robinson's findings at the consultative examinations. (*Id.*) The ALJ also considered the paragraph C criteria of Listing 12.02 and found that there was no evidence establishing that criteria. (*Id.*) As for the remaining criteria contained in Listing 12.05, the ALJ determined that Claimant did not meet the paragraph A criteria for mental incapacity given her abilities to care for her child, take care of her personal hygiene, shop for groceries, pay bills, count change, and use a checkbook or money orders. (*Id.*) With regard to the paragraph B criteria of Listing 12.05, the ALJ found that Claimant did not have a valid IQ verbal, performance, or full scale IQ score of 59 or less. (Tr. at 22). In relation to the paragraph C criteria of Listing 12.05, the ALJ concluded that Claimant did not have a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function. (*Id.*) In support of this finding, the ALJ stated that "the valid results of intelligence testing demonstrate[]

low average to borderline intellectual functioning." (*Id.*) Finally, the ALJ also stressed (in his RFC discussion) that Dr. Blair opined there was no evidence of deficits in adaptive functioning before the age of 22. (Tr. at 26).

In addressing Claimant's RFC, the ALJ summarized Claimant's testimony, her reports of activities of daily living, the opinion evidence, and the testimony of the medical experts at both administrative hearings. (Tr. at 22-26). The ALJ recognized that the first hearing was continued after school records not belonging to Claimant were discovered in Claimant's file. (Tr. at 25). After summarizing Dr. Blair's testimony at the second hearing nearly verbatim, the ALJ assigned Dr. Blair's opinion "significant weight" and incorporated the opinion into the RFC finding. (Tr. at 26).

Having reviewed the ALJ's written decision, the undersigned **FINDS** that Claimant's contention that *the ALJ* considered evidence not belonging to her is unsupported by the record. The ALJ recognized at both administrative hearings that certain evidence should not be considered because it did not relate to Claimant. (Tr. at 35-36, 79). Although in his written decision the ALJ summarized the evidence not attributable to Claimant when discussing Dr. Blair's testimony at the first administrative hearing, immediately thereafter the ALJ noted that those records discussed by Dr. Blair did not belong to Claimant.[6] (Tr. at 25). To the extent that the ALJ considered Ms. Robinson's evaluations, the ALJ largely adopted those portions of her examinations that were not affected by the erroneous school records, including her findings as to concentration and social functioning. (Tr. at 20-21). The ALJ also cited Ms. Robinson's

---

[6] The ALJ apparently made a typographical error when initially discussing the records that did not belong to Claimant and referred to them as Exhibit **2F**. (Tr. at 25). However, the ALJ later correctly stated in his written decision that Exhibit **2E** was one of the exhibits containing records that did not belong to Claimant. (Tr. at 25, 257).

evaluations for the information that Claimant reported to her, which would not be tainted by the incorrect school records. (Tr. at 19-21). As for Ms. Robinson's citation to an erroneous record when addressing Claimant's IQ scores obtained at the second evaluation, she provided other reasons for finding that Claimant's scores were invalid. (Tr. at 19). Specifically, Ms. Robinson noted that Claimant's obvious disinterest, and her persistence and pace during the test, rendered the results invalid. (Tr. at 557). Ms. Robinson only mentioned the full scale IQ score of 93 as *an additional factor* for the discrediting the results. (*Id.*) Consequently, it appears very unlikely that Ms. Robinson's validity opinion would have changed had she excluded the incorrect records.[7]

Furthermore, explicitly disregarding the full scale IQ score of 93 that Ms. Robinson incorrectly attributed to Claimant, Dr. Blair opined at the second administrative hearing that the results of the WAIS-IV at the second consultative examination were invalid given the observations made by Ms. Robinson of Claimant's behavior during the test and Claimant's history, including "what she has done in life" and her previous test scores. (Tr. at 41). Dr. Blair's analysis comports with the introductory section to the listing for mental disorders, which emphasizes viewing intelligence test scores not in a vacuum, but rather in light of a claimant's *functional ability* and developmental history. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(D)(6)(a); *see also Hancock v. Astrue*, 667 F.3d 470, 474-75 (4th Cir. 2012) (recognizing importance of "actual functioning" in assessing intelligence test scores). In

---

[7] As for Ms. Robinson's less severe diagnosis at the second evaluation, both Dr. Blair at the second administrative hearing and Ms. Robinson in her first report opined that Claimant suffered from borderline intellectual functioning. (Tr. at 26, 382). The ALJ adopted this diagnosis at step two. (Tr. at 19). Ms. Robinson arrived at this diagnosis after the first consultative evaluation, during which Claimant achieved a verbal comprehension IQ of 66, a perceptual reasoning IQ of 77, and full scale IQ of 71. (Tr. at 381). As such, Ms. Robinson did not diagnose Claimant with mental retardation even in the face of the IQ scores from the first evaluation, which she deemed valid.

addition, the opinion adopted by the ALJ as to Claimant's psychological limitations was provided by Dr. Blair at the second administrative hearing, and Dr. Blair clearly did *not* consider records concerning another person in forming his opinions.[8] (Tr. at 26, 41-42). Overall, the undersigned **FINDS** that ALJ recognized that certain evidence in Claimant's file did not belong to her throughout the administrative process, and his written decision is sufficiently clear as to what evidence he considered in this case. Consequently, Claimant's due process argument fails.

To the extent that Claimant argues that "the record was left without the benefit of an updated psychological consultative examination," which Dr. Blair recommended, her argument is unpersuasive. (ECF No. 14 at 2). At the first administrative hearing, Dr. Blair was equivocal as to the necessity of an updated psychological consultative examination testifying that "it wouldn't hurt" to obtain one. (Tr. at 79-80). He added that his opinions as to the validity and reliability of Claimant's intelligence test results would still be relevant even if another psychological consultative examination were ordered. (Tr. at 80). Furthermore, at the second administrative hearing, Dr. Blair did not assert that he needed more information from an additional consultative examination before forming his opinions. Instead, Dr. Blair cited certain findings from Ms. Robinson's second consultative evaluation while discarding those portions of the evaluation related to the erroneous school records. Finally, Claimant has not alleged what beneficial information an additional psychological consultative examination would

---

[8] With respect to Claimant's argument that the ALJ failed to specify the weight given to Ms. Robinson's opinion, any error was harmless. As discussed above, the ALJ clearly disregarded any portion of Ms. Robinson's opinion that was tainted by the incorrect school records. Moreover, the ALJ ultimately assigned significant weight to Dr. Blair's testimony and opinions, and Dr. Blair considered Ms. Robinson's findings and opinion in forming his opinions *after* acknowledging that Ms. Robinson had considered an erroneous school record.

have revealed; particularly, in light of the prior opinions that Claimant functioned at a borderline intellectual level based upon reliable evidence in addition to her IQ prior scores.

## VIII.  **<u>Recommendations for Disposition</u>**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 13), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*,

727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  July 31, 2015

Cheryl A. Eifert
United States Magistrate Judge

31